**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

**MISSISSIPPI LIMESTONE CORP.**                         **PLAINTIFF**

**v.**                **NO. 4:06-CV-01097 GTE**

**UNITED STATES OF AMERICA**                       **DEFENDANT**

**v.**

**JANTRAN, INC, in personam and the**
**MOTOR VESSEL BROTHER WILSON, its Engines,**
**Apparel, Tackle Appurtenances, etc., in rem**        **THIRD-PARTY DEFENDANT**

## <u>MEMORANDUM OPINION</u>

A bench trial was conducted in this action from April 7 through April 9, 2008. The Court, having heard all the evidence and the arguments of the parties, concludes that the Defendant United States is solely liable to pay the full measure of the damages sustained by Plaintiff Mississippi Limestone Company, which are stipulated to be $548,262.86.

The Court's conclusion is supported by the following findings of fact and conclusions of law.

## I.    FINDINGS OF FACT

The following facts, paragraphs 1 through 17, were stipulated to by the parties.

1.    The Montgomery Point Lock and Dam is a public work, pursuant to the Rivers and Harbors Act.

2.    The navigation pass is 300 feet wide.

3.    The navigation pass is used for navigation during high water periods.

4.    The abutment pier is 150 feet long and parallel to the navigation pass.

5.      Prior to February 5, 2005, the abutment pier was equipped with a blue navigation beacon, fixed atop a 45 foot light pole.

6.      On February 5, 2005 and February 6, 2005, the abutment pier was completely underwater.

7.      The M/V BROTHER WILSON's three barge tow was approximately 105 feet wide on February 5, 2005 and February 6, 2005.

8.      The M/V CLINT DAVIS is 60 feet long and 26 feet wide.

9.      The M/V GIST WILBUR is 21 feet long and 13 feet wide.

10.     The U.S. Coast Guard and  the U.S. Army Corps of Engineers approved all salvage operations at the Montgomery Point Lock and Dam on February 5, 2005 and February 6, 2005.

11.     Mississippi Limestone Corporation owned and operated the M/V CLINT DAVIS on February 5, 2005 and February 6, 2005.

12.     JANTRAN, INC. owned and operated the M/V BROTHER WILSON on February 5, 2005 and February 6, 2005.

13.     The U.S. Army Corps of Engineers owned and operated the M/V GIST WILBUR on February 5, 2005 and February 6, 2005.

14.     On February 5, 2005 the M/V BROTHER WILSON was pushing a 12 barge tow through the navigation pass at the lock and dam and struck the submerged abutment pier.

15.     Following the accident of February 5, 2005, JANTRAN, INC. contracted with Mississippi Limestone Corporation to assist in salvage operations for two barges that had grounded on the submerged abutment pier.

16.     The two grounded barges were removed from the wall and pushed against the

river bank upstream of the lock and dam.

17.     Mississippi Limestone Corporation has sustained damages in the amount of $548,262.86 as a result of the M/V CLINT DAVIS alliding with the underwater abutment pier.

18.     As a result of the allision between the M/V BROTHER WILSON and the submerged abutment pier on February 5, 2005, the White River was closed until the two barges could be removed. This circumstance created a sense of urgency on the part of those in charge of the Montgomery Lock and Down. They were anxious to restore traffic through the navigation pass as soon as safely possible.

19     Third-party Defendant Jantran, owner of the M/V BROTHER WILSON, retained Bob Mallette, a marine surveyor, to assist the M/V BROTHER WILSON in the removal of the barges. Mr. Mallette arrived on the scene on February 5, 2005, at 11:00 a.m. He devised a salvage plan for the removal of the barges, which was approved by the U.S. Coast Guard. The barges were successfully removed from the abutment pier by 4:00 a.m. on February 6, 2005.

20     Mr. Mallette also proposed a transit plan to get the M/V BROTHER WILSON, with tow, through the navigation pass to the U.S. Coast Guard for approval. The Coast Guard modified the transit plan by insisting on two additional requirements. First, the Coast Guard insisted that the submerged abutment pier be marked by having the Corps of Engineers boat, the M/V GIST WILBUR, take and hold a position over the submerged abutment pier during the passage of the M/V BROTHER, with its three barge tow, through the navigation pass. Second, Second, the U.S. Coast Guard insisted that an "assist boat" accompany the M/V BROTHER WILSON during the transit by positioning itself on the M/V BROTHER WILSON's port side. The M/V CLINT DAVIS, owned by Mississippi Limestone Corporation, was to act as the assist boat, the idea being that if the M/V BROTHER WILSON started moving to port the M/V CLINT

DAVIS would nudge it back on course.

21.     While plans were being made for the M/V BROTHER WILSON to transit the lock, the U.S. KANAWHA, a U.S. Coast Guard vessel, was on its way to the lock with buoys to mark the location of the submerged pier.   The Corps of Engineers was aware that the U.S. KANAWHA was en route and due to arrive in three hours when  Bob Harris with the Corps of Engineers made the decision not to wait on the U.S. KANAWHA and instead to proceed with the plan to have Mr. Morehouse use the M/V GIST GILBUR to mark the left descending abutment wall.  Mr. Harris made this decision despite the fact that Mr. Morehouse advised against it and specifically advised Mr. Harris that it was dangerous and a bad idea.

22.     Bob Mallette took a position in his own small boat upstream in order to have a clear view of all three boats as the M/V BROTHER WILSON tow began its approach to the pass. Mr. Mallette witnessed and photographed the entire transit effort up to the point at which the M/V CLINT DAVIS allided on the submerged abutment pier.  His photographs taken at the time are in evidence as Exhibit 22B, 22C, 22D and 22E.  (Those photographs, as explained by Mr. Mallette, were very helpful to the Court in resolving some of the important factual issues).  The entire transit effort, from start to the allision of the M/V CLINT DAVIS on the submerged left descending abutment pier, lasted approximately four minutes.

23.     Absent unusual currents within the navigation pass, barge tows attempt to transit the 300 ft. wide navigation channel near the center line.  This practice give mariners freedom to make downstream corrections during the transit.  There is no evidence of unusual currents within the navigation pass during the time period within which the M/V BROTHER WILSON and the M/V CLINT DAVIS were transiting the pass.

24.     The M/V BROTHER WILSON was attempting to proceed down the centerline of

the navigation pass while keeping the starboard lock wall and the M/V GIST WILBUR about equal distance from its tow.

25       As the transit effort began, all three boats involved were in radio communication, tuned to Channel 68.  Mr. Mallette, from his oversight boat, was also tuned to Channel 68.  The Court credits the testimony of Jack Mezza, William Barfield and Bob Mallette that all involved parties, including Mr. Morehouse, were monitoring Channel 68 both before and throughout the entire effort to transit the navigation pass.  At no time did Mr. Morehouse or any other representative of the Corps of Engineers or the Coast Guard give any indication over the radio that there was any issue or problem with the transit effort.

26       As the M/V BROTHER WILSON was in transit, the M/V GIST WILBUR, through Mr. Morehouse, repeatedly reported that it was "on station" over the port abutment pier. This representation from Mr. Morehouse occurred four times during the brief transit period, the last being just seconds before the M/V CLINT DAVIS actually hit the abutment pier.  In fact, the M/V GIST WILBUR was at no time over the submerged abutment pier during the transit period. Indeed, from all the evidence the M/V GIST WILBUR appears to have been located some 100 or more feet closer to the left descending shoreline than Mr. Morehouse represented.   (It is possible that Mr. Morehouse may have been marking another underwater concrete structure which he erroneously believed to be the submerged abutment pier marking the port side of the navigation pass.)

27.      There is a factual dispute as to whether Mr. Morehouse directed the M/V BROTHER WILSON to hug the visible right lock wall as it transited through the pass.  The Court credits the testimony of Jack Mezza, William Barfield and Bob Mallette all of whom testified that Mr. Morehouse gave no such direction.  The Court finds that at no time did Mr.

Morehouse or any other representative from the Corps of Engineers or the Coast Guard give instructions to the M/V BROTHER WILSON or the M/V CLINT DAVIS to hug, or to favor, the visible starboard lock wall during the transit of the navigation pass.

28.     There is a factual dispute as to whether the M/V CLINT DAVIS or the M/V BROTHER WILSON made a sudden movement to the left which caused Mr. Morehouse to, in his words, fear for his life and to quickly move his boat off his mark.  The Court credits the testimony of Jack Mezza, William Barfield and Bob Mallette all of whom testified that this did not occur and that the M/V GIST WILBUR steadily maintained its general centerline position during the entire time.  The Court finds that at no time during the transit was either the  M/V BROTHER WILSON or the M/V CLINT DAVIS bearing down on or moving toward the M/V GIST WILBUR.  The Court further finds that at no time during the transit did the M/V GIST WILBUR abruptly change its location to avoid being hit by the  M/V BROTHER WILSON or the M/V CLINT DAVIS.  At the time that the M/V CLINT DAVIS struck the abutment pier, the M/V GIST WILBUR was holding its position some 100 plus feet to the port of the M/V CLINT DAVIS.

29.     The Court finds that the M/V BROTHER WILSON and the M/V CLINT DAVIS would not have attempted to transit through the navigation channel in the manner in which they did if the M/V GIST WILBUR had not represented that it was marking the submerged left descending abutment pier  The Court further credits the testimony of Jack Mezza, captain of the M/V BROTHER WILSON, that he would not have attempted to transit the lock using his radar alone or without visual sight of both walls.  Further, visibility was excellent at all relevant times on February 6, 2005.

30.     The Court finds that the M/V BROTHER WILSON relied heavily upon the M/V

GIST WILBUR to mark the submerged left descending abutment pier as it navigated down the navigation pass.  The Court further finds that such reliance was reasonable under the totality of the circumstances.

## II.        CONCLUSIONS OF LAW

1.        It is undisputed that this Court has subject matter jurisdiction over Plaintiff's general maritime law negligence claim against the United States.  Sovereign immunity is waived in this case by the Suits in Admiralty Act, 46 U.S.C. § 741, *et seq*., or the Public Vessels Act, 46 U.S.C. §§ 781, *et seq*.

2.        The U.S. Corps of Engineers and the U.S. Coast Guard were under no duty to act, but once they elected to act, and caused the M/V BROTHER WILSON and the M/V CLINT DAVIS to justifiably rely on its actions, the duty arose "to act reasonably and with due care to prevent a navigational aid from becoming 'a trap for the ignorant or unwary rather than a warning of danger.'"  *Eklof Marine Corp. v. United States*, 762 F.2d 200, 203 (2d cir. 1985).

3.        The Court concludes that the U.S. Corps of Engineers and the U.S. Coast Guard, through its employees, were negligent in ordering Mr. Morehouse to attempt to mark the submerged abutment pier with his boat and in disregarding his opinion that it was dangerous to do so when the better and safer course would have been to wait for the Coast Guard vessel, the KANAWHA, which was scheduled to arrive with marker buoys in three hours.  Such negligence was a proximate cause of the allision of the M/V CLINT DAVIS with the unmarked and submerged left descending abutment pier.

4.        The Court concludes that the U.S. Corps of Engineers' employee Norman Morehouse acted negligently by representing that he was marking the submerged left abutment pier on February 6, 2005, when in fact he was not, and that his negligence was a proximate cause

of the allision of the M/V CLINT DAVIS with the unmarked and submerged left descending abutment pier.

5.      The Court concludes that there was no negligence on the part of either the M/V CLINT DAVIS or the M/V BROTHER WILSON which caused or contributed to the allision of the M/V CLINT DAVIS.  Both the M/V CLINT DAVIS and the M/V BROTHER WILSON acted reasonably and with due care under these particular circumstances.  Accordingly, the Court rejects the United States' claim for judgment over or for comparative fault against the Third-Party Defendant Jantran.  The United States' Third-Party Complaint will therefore be dismissed.

6.      Judgment in the sum of $548,262.86, plus pre-judgment interest, will be awarded to Plaintiff Mississippi Limestone Corporation.

IT IS SO ORDERED this  10th   day of April, 2008.

_/s/Garnett Thomas Eisele_____
UNITED STATES DISTRICT COURT